Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re Wrap Technologies, Inc. Securities Exchange Act Litigation* | Case No: 2:20-cv-08760-DMG (PVCx)<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Lead Plaintiff Timothy O'Hern ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Wrap Technologies, Inc. ("Wrap" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of persons or entities who purchased Wrap common stock between April 29, 2020 and September 23, 2020, inclusive (the "Class Period").[1] Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Founded in 2016, Wrap purports to be a "security technology" company that sells policing tools to police departments and other law enforcement agencies.

3.      Since its founding, Wrap has only developed one product: the BolaWrap™ 100 ("BolaWrap"). BolaWrap is a hand-held remote restraining device

---

[1] Excluded from the class are all Defendants, the present and former officers and directors of Wrap and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any such excluded persons have or had a controlling interest. Also excluded from the Class are persons or entities who have a net profit in purchases and sales of Wrap common stock or otherwise suffered no compensable damages under the securities laws during the Class Period.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

that purports to allow an officer to discharge a cord that wraps a suspect from a distance of 10 to 25 feet.

4.     Wrap began marketing the BolaWrap in late 2017. Sales, however, have been underwhelming. Revenue from BolaWrap was approximately $18,000 in 2018, rising to approximately $650,000 in 2019. Because Wrap is a single-product company, its revenue is dependent on BolaWrap. As a result of BolaWrap's anemic sales, Wrap has never turned a profit, posting net losses of $3.3 million and $8.3 million in 2018 and 2019, respectively.

5.     A major reason for BolaWrap's lack of commercial success has been Wrap's inability to secure orders from large police departments. Thus, a key element of Wrap's business strategy is to garner interest from large police departments by offering them free BolaWrap trainings and trials, with the hope that this would lead to greater visibility and more orders for the BolaWrap.

6.     On February 5, 2020, the Los Angeles Police Department ("LAPD") began a 90-day trial of BolaWrap, with built-in extensions that, if exercised, could extend the trial to 180 days (the "LAPD Pilot Program").

7.     The LAPD Pilot Program was critical to Wrap. The LAPD is one of the largest, most sophisticated, and well-known police departments in the United States. A successful LAPD Pilot Program would be a tremendous boon to Wrap's sales, as it would likely lead to a lucrative contract for BolaWrap, while also significantly enhancing the marketability and credibility of BolaWrap as a viable policing tool.

8.     Wrap was eager to hype the LAPD Pilot Program. During an earnings call with investment analysts on April 29, 2020, Defendant Michael Rothans ("Rothans"), Wrap's Chief Technology Officer, falsely stated that the LAPD was making "very good" progress with its trial of the BolaWrap; specifically, Rothans told analysts that the LAPD had "used [the BolaWrap] quite a bit. In fact, they've

2

used it more than we anticipated they would be using it and the success rate has been really outstanding."

9.     On the same call, Defendant Thomas Smith ("Smith"), Wrap's President, backed Rothan's misrepresentation, telling analysts that "we have seen [the LAPD] use it more than we anticipated in the trial period[.]"

10.     In truth, the LAPD was barely using the BolaWrap. Indeed, as of the April 29, 2020 earnings call – almost three months into the LAPD Pilot Program – the LAPD had used the BolaWrap just eight times.

11.     Moreover, the performance of the BolaWrap during the LAPD Pilot Program was underwhelming. Of the eight times that the BolaWrap was deployed as of the April 29, 2020 earnings call, the LAPD judged the BolaWrap to have been effective six times and ineffective twice; in other words, the BolaWrap was deemed *ineffective* 25% of the times that it was used.

12.     Worse, even though the LAPD categorized six of the eight utilizations of the BolaWrap as effective, only once did the BolaWrap do what it was advertised to do (*i.e.,* wrap a suspect). The other five utilizations were deemed effective because the BolaWrap simply startled or confused the suspect just long enough for the suspect to be apprehended by an LAPD officer. Hence the "success rate" of the BolaWrap was nowhere close to "really outstanding," as Defendant Rothans falsely touted during the April 29, 2020 earnings call.

13.     Due to the extremely small sample size and the mixed results, the LAPD could not make a decision on the BolaWrap when the 180-day trial period ended in August of 2020. Instead, the LAPD sought and obtained an extension to test the BolaWrap for another 180 days.

14.     On September 23, 2020, White Diamond Research, a securities research firm, published a report (the "White Diamond Report") on the investment website Seeking Alpha. The White Diamond Report highlighted the LAPD's limited use of the BolaWrap despite having 200 BolaWraps in its possession and

more than 1,100 officers trained to use it. The White Diamond Report also analyzed in detail each of the times that the LAPD used the BolaWrap, explaining that the BolaWrap only performed as advertised once. The White Diamond Report thus thoroughly debunked Defendants' statements that the LAPD Pilot Program was making "very good" progress, that the LAPD was using the BolaWrap "quite a bit," and that the success rate of the BolaWrap was "really outstanding."

15.     Following the publication of the White Diamond Report, the price of Wrap common stock declined by $2.07 per share, or more than 25% from its previous-day closing price, to close at $6.07 per share, damaging Plaintiff and other Wrap investors.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

18.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

19.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

20.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails,

4

interstate telephone communications and the facilities of a national securities exchange. Defendants disseminated the statements alleged to be false and misleading herein into this district, and Defendants solicited purchasers of Wrap securities in this district.

## PARTIES

21.    Plaintiff purchased Wrap common stock at artificially inflated prices during the Class Period and was damaged thereby. Plaintiff's PSLRA certification was previously filed with the Court as ECF No. 25-2.

22.    Defendant Wrap purports to develop tools for law enforcement agencies. Defendant Wrap is incorporated in Delaware and maintains its principal executive offices at 1817 W 4th Street, Tempe, Arizona 85281. Wrap's common stock is listed on NASDAQ under the ticker symbol "WRTC."

23.    Defendant David Norris ("Norris") served as the Chief Executive Officer ("CEO") and Director of the Company from December 2018 to July 30, 2020.

24.    Defendant Marc Thomas ("Thomas") served as the CEO of the Company from July 30, 2020 until his resignation on October 27, 2020.

25.    Defendant James A. Barnes ("Barnes") served as the Chief Financial Officer, Secretary, and Treasurer of the Company throughout the Class Period.

26.    Defendant Smith served as the Company's President throughout the Class Period. He was named Interim CEO following Defendant Thomas' resignation, and became CEO on March 8, 2021.

27.    Defendant Rothans served as the Company's Chief Technology Officer from November 2018 to July 2020, after which he became the Company's Chief Strategy Officer.

28.    Defendants Norris, Thomas, Barnes, Smith, and Rothans are collectively referred to herein as the "Individual Defendants."

29.    Each of the Individual Defendants:

5

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

30.    The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

31.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

32.    The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS

### Background

33.   Wrap was founded in 2016 as a security technology company; its objective was to develop and sell modern policing tools to law enforcement agencies.

34.   In November 2017, Wrap began marketing its first (and only) product: the BolaWrap. The BolaWrap is a handheld device that discharges a lasso-like cord to wrap a suspect from 10 to 25 feet away.

35.   Wrap's website describes the BolaWrap as a "hand-held remote restraint device that discharges an 8-foot bola style Kevlar® tether at 513 feet per second ***to wrap a subject's*** legs or arms at an effective range of 10-25 feet." (emphasis added). Wrap's promotional videos for the BolaWrap, available on its website and on YouTube, show the BolaWrap rapidly discharging a cord that completely wraps around uncooperative suspects.

36.   In 2018, Wrap focused on marketing BolaWrap, holding demonstrations and setting up trial programs with law enforcement agencies. Hence in 2018 Wrap generated minimal revenue (*i.e.* approximately $18,000 from product sales), and suffered losses of more than $3.3 million.

37.   Despite Wrap's marketing efforts in 2018, interest in the BolaWrap remained lukewarm in 2019. While Wrap did manage to secure a number of contracts for the BolaWrap in 2019, they were with very small police departments, for a small number of devices. In 2019, Wrap generated less than $700,000 in revenue, and suffered losses of over $8.6 million.

38.   To increase the visibility of the BolaWrap, and to establish the BolaWrap as a viable policing tool, the Company understood that it would need to garner interest from large police departments. Hence Wrap intensified its efforts to provide demonstrations and arrange free trials with large police departments.

39.    Its efforts appeared to pay off when, in December 2019, the LAPD agreed to start a trial program to evaluate the BolaWrap for possible purchase by the LAPD.

40.    When Wrap announced the LAPD trial on December 3, 2019, its share price immediately shot up by over 17%.

41.    The LAPD Pilot Program officially began on February 5, 2020. It was intended to last 90 days, but included options for extensions that could extend the trial period to 180 days.

42.    As part of the LAPD Pilot Program, Wrap provided the LAPD with 200 BolaWraps and trained approximately 1,100 LAPD officers to use the BolaWrap.

### Defendants Make False and Misleading Statements about the LAPD Pilot Program

43.    On April 29, 2020, Wrap held a conference call with investment analysts to discuss its financial results for the first quarter of 2020 (the "Earnings Call"). Defendants Norris, Barnes, Smith, and Rothans participated in this call.

44.    Not surprisingly, investment analysts were curious about the progress of the LAPD Pilot Program, which was almost nearing the end of the initial 90-day trial period. During the Q&A session of the Earnings Call, in response to a question concerning whether the LAPD was looking for a "certain number of use cases" for the BolaWrap before making a purchase decision, Defendant Rothans made the following false statement:

> "[T]he progress has been very good. ***They've used it quite a bit. In fact, they've used it more than we anticipated*** they would be using it and the ***success rate has been really outstanding.***" (emphasis added)

45.    Defendant Smith then doubled down on Defendant Rothans' false statement, repeating that "we have seen them use it more than we anticipated in the trial period."

46.     The statements by Defendants Rothans and Smith were false and misleading because: (1) the LAPD had only used the BolaWrap eight times as of the date of the Earnings Call, despite having 200 BolaWraps in its possession and over 1,100 officers trained to use it. As such, no reasonable person could have said that the LAPD was using the BolaWrap "quite a bit," and no reasonable person would have described the progress of the LAPD Pilot Program as "very good"; and (2) the LAPD determined that the BolaWrap was ineffective in two of the eight times that it was deployed as of the date of the Earnings Call, a failure rate of 25%, and of the six times that it was deemed effective, the BolaWrap only performed as advertised (*i.e.* wrap a suspect) once. The other five utilizations were deemed effective because the BolaWrap startled or confused the suspect just long enough for them to be apprehended by an LAPD officer.  Thus, no reasonable person would have characterized the success rate of the BolaWrap as "really outstanding."

## **The LAPD Issues Interim Results from the BolaWrap Trial**

47.     During the weekly meeting of the Los Angeles Board of Police Commissioners ("LAPD Commission") held on August 25, 2020, the LAPD sought authorization from the LAPD Commission to extend the LAPD Pilot Program for another 180 days due to insufficient sample size from the initial 180-day trial. In connection with the extension request, the LAPD issued and posted on the LAPD website a report to the LAPD Commission detailing the LAPD's use of BolaWrap from February 5, 2020 to August 10, 2020 (the "LAPD BolaWrap Report").

48.     The LAPD BolaWrap Report shows that from the inception of the LAPD Pilot Program to April 29, 2020 – the date on which Defendants Rothans and Smith told investment analysts that the LAPD had been using the BolaWrap "quite a bit," "more than we anticipated," and that trial was making "very good" progress – the LAPD used the BolaWrap a mere eight times. In total, the LAPD used the BolaWrap nine times during the initial 180-day trial period.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

49.     While articles appeared in the *Los Angeles Times* and the *Los Angeles Daily News* on August 25, 2020 concerning the additional 180-day extension of the LAPD Pilot Program and the LAPD BolaWrap Report, the price of Wrap common stock did not decline on August 25, 2020. Indeed, the price of Wrap common stock was buoyed on that day for at least two reasons:

- The LAPD Commission unanimously agreed to the LAPD's request to extend the BolaWrap pilot program for an additional 180 days.

- In making the request for authorization of the 180-day extension, a LAPD Deputy Chief told the LAPD Commission during the August 25, 2020 commission meeting that the LAPD remained "optimistic" about the BolaWrap, and this (as well as the LAPD Commission's unanimous decision to approve the extension) was mentioned in both the *Los Angeles Times* and the *Los Angeles Daily News* articles.

50.     While the *Los Angeles Daily News* article also that the BolaWrap only fully wrapped a suspect in one instance, the article also contained quotes from a LAPD Deputy Chief speaking positively about the BolaWrap, blunting the impact of the negative news. Significantly, neither the *Los Angeles Times* or the *Los Angeles Daily News* articles provided a link to the LAPD BolaWrap Report or mentioned where the LAPD BolaWrap Report can be found.

**Defendants Fail to Update or Correct their Prior Misrepresentations**

51.     Wrap participated in two investor conferences following the release of the LAPD BolaWrap Report, but never bothered to correct Defendants' Rothans' and Smith's prior misrepresentations about the LAPD Pilot Program, and failed to update investors about the issuance or existence of the LAPD BolaWrap Report.

52.     On September 3, 2020, Wrap participated in the LD500 virtual investor conference. Defendant Smith represented Wrap at the conference. During this conference, Defendant Smith spoke about the LAPD Pilot Program, touting the fact that the LAPD trained 1,100 officers to use the BolaWrap and have more than

10

200 BolaWrap in its possession. Defendant Smith further stated that the LAPD has had great feedback from its officers about the BolaWrap. Defendant Smith did not disclose the existence of or results from the LAPD BolaWrap Report.

53.     On September 9, 2020, Wrap participated in the 9th Annual Gateway Conference with investors and investment analysts. Defendant Smith represented Wrap at this conference. During this conference, Defendant Smith spoke about the LAPD Pilot Program, but again failed to disclose the existence of or results from the LAPD BolaWrap Report.

**THE TRUTH EMERGES**

54.     On September 23, 2020, White Diamond Research issued the White Diamond Report. Taking a deep dive into the LAPD BolaWrap Report, White Diamond Research highlighted the fact that the LAPD only used the BolaWrap nine times over a six-month trial period, and that this was a startlingly low usage given that the LAPD received 200 BolaWraps from the Company and spent the time to train more than 1,100 officers to use the device.

55.     Beyond pointing out that the LAPD deemed the BolaWrap effective in just six out of the nine times that it was used during the LAPD Pilot Program (or a failure rate of 33%), the White Diamond Report also reprinted a description of each usage of the BolaWrap from the LAPD BolaWrap Report, which clearly showed that only in one of the nine instances did the BolaWrap perform as advertised: wrap a suspect.

56.     Without other news to buoy its stock price, the adverse disclosures in the White Diamond Report caused Wrap's common stock to decline by $2.07 per share, or over 25%, from its previous-day closing price, to close at $6.07 per share on September 23, 2020, damaging Plaintiff and other Wrap investors.

**DEFENDANTS' FALSE STATEMENTS WERE MATERIAL**

57.     It was material for investors to know (1) whether the LAPD was utilizing the BolaWrap such that there would be a sufficient sample size for the

LAPD to make a purchasing decision as soon as possible, and (2) whether the LAPD Pilot Program showed that the BolaWrap was working as advertised.

58.     As a single-product company, Wrap is dependent on the BolaWrap to generate revenue. The quicker the LAPD is able to obtain a sufficient sample size from the LAPD Pilot Program to make a purchasing decision, the sooner Wrap can: (1) potentially receive a large and lucrative order from the LAPD; and (2) capitalize on the LAPD's decision (if positive) to enhance Wrap's marketing efforts and establish the BolaWrap as a viable policing tool used by one of the world's most sophisticated police departments.

59.     For a Company that has never generated a profit and whose losses almost tripled from 2018 to 2019, Wrap needed to show investors that it is still a good investment, and being told that the LAPD Pilot Program was seeing "very good" progress impacted investors' evaluation of Wrap as an investment target.

60.     Moreover, knowing LAPD's usage of BolaWrap provides insight for investors into how practical the device is in real life policing situations. By telling investors that the LAPD was using the BolaWrap "quite a bit" with a "really outstanding" success rate,  Defendant Rothans falsely assuaged investors' concerns about the practicality of the BolaWrap.

61.     Additionally, the actual performance of the BolaWrap was of critical importance to investors. Thus it was misleading and reckless for Defendant Rothans to tell investors during the Earnings Call that the success of the BolaWrap during the LAPD Pilot Program was "really outstanding" when it actually was deemed ineffective 25% of the times that it was deployed, and in all but one of the instances that it was considered effective, it was deemed so simply because it startled or confused the suspect long enough for an officer to take the person into custody – not because the BolaWrap managed to wrap the suspect.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

62.    Even if the LAPD considers "effective" each BolaWrap deployment that simply confused or startled a suspect, other police departments are unlikely to spend money buying a remote wrapping device that does not actually wrap.

63.    Indeed, if investors knew that (1) the LAPD was barely using the BolaWrap despite having 200 devices in its possession and training 1,100 officers to use it, and that the LAPD Pilot Program might potentially languish for more than a year without a decision from the LAPD; and (2) as of the date of the Earnings Call, the LAPD had determined the BolaWrap to be ineffective 25% of the time, and in five of the six times that it was judged to be effective, the BolaWrap actually did not perform as advertised and failed to wrap the suspect, their evaluation of Wrap as an investment would have been different, and the value investors assigned to Wrap's share price would have been lower.

## POST-CLASS PERIOD DEVELOPMENTS

64.    With the 180-day extension authorized on August 25, 2020, the LAPD Pilot Program would have concluded on February 21, 2021. As of the date of this filing, the LAPD still has not decided whether to order the BolaWrap. During an earnings call with investment analysts on March 4, 2021, Defendant Smith said that he expects LAPD to seek another extension and continue testing the BolaWrap.

## ADDITIONAL SCIENTER ALLEGATIONS

65.    On September 24, 2021, Wrap posted a video on YouTube, that, among other things, discussed the LAPD Pilot Program. In the video, Defendant Smith described Defendant Rothans as having been in "constant communication with the LAPD" throughout the entire LAPD Pilot Program. Defendant Rothans confirmed in the video that he had been speaking with the LAPD on a weekly basis about the BolaWrap for the "last two years."

66.    Because of his constant, weekly communications with the LAPD throughout the duration of the LAPD Pilot Program, Defendant Rothans was aware

of how frequently the LAPD had been using the BolaWrap, as well as how BolaWrap truly performed in the field.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased Wrap common stock between April 29, 2020 and September 23, 2020, inclusive (the "Class"). Excluded from the Class are all Defendants, the present and former officers and directors of Wrap and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any such excluded persons have or had a controlling interest. Also excluded from the Class are persons or entities who have a net profit in purchases and sales of Wrap common stock or otherwise suffered no compensable damages under the securities laws during the Class Period.

68.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Wrap common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class.

69.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

71.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Exchange Act;

b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and prospects of the Company;

c)      whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)      whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

e)      whether Defendants acted knowingly or recklessly in issuing false filings;

f)      whether the prices of Wrap common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

73.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

a)     Wrap common stock met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

b)     As a public issuer, the Company filed periodic public reports with the SEC;

c)     Wrap regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d)     Wrap common stock was liquid and traded with moderate to heavy volume during the Class Period; and

e)     The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

74.     Based on the foregoing, the market for Wrap common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

75.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

## COUNT I
### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against Wrap, Rothans, and Smith

76.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

77.     This Count is asserted against Defendants Wrap, Rothans, and Smith is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

78.     During the Class Period, Defendant Wrap, Rothans, and Smith, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     Defendants Wrap, Rothans, and Smith violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Wrap common stock during the Class Period.

80.     Defendants Wrap, Rothans, and Smith acted with scienter in that they knew that the statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated,

17

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

or acquiesced in the issuance or dissemination of such statements as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Wrap's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

81.     Defendants Rothans and Smith, who are or were the senior officers and/or directors of the Company, had actual knowledge of the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Wrap personnel to members of the investing public, including Plaintiff and the Class.

82.     As a result of the foregoing, the market price of Wrap common stock was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Wrap securities during the Class Period in purchasing Wrap common stock at prices that were artificially inflated as a result of Defendants' false and misleading statements.

83.     Had Plaintiff and the other members of the Class been aware that the market price of Wrap's common stock had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Wrap's common stock at the artificially inflated prices that they did, or at all.

84.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

85.     By reason of the foregoing, Defendants Wrap, Rothans, and Smith have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Wrap's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

86.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

87.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Wrap's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

88.     As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Wrap's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

89.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various statements that Wrap disseminated in the marketplace during the Class Period concerning the Company's business operations and prospects. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in

19

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

the unlawful conduct alleged which artificially inflated the market price of Wrap securities.

90.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)     declaring this action to be a proper class action, certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Class Counsel;

(b)     awarding damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, together with interest thereon;

(c)     awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: March 12, 2021

**THE ROSEN LAW FIRM, P.A.**
/s/Laurence M. Rosen
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi (*pro hac vice*)
275 Madison Ave, 40th Floor
New York, NY 10016

20

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

*Counsel for Plaintiff and the Proposed Class*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of March, 2021, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

_/s/  Laurence M. Rosen_
Laurence M. Rosen

---

22